UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SHAWN R. DOTSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-03191-JMS-TAB |
| | ) | |
| WEXFORD OF INDIANA, LLC., | ) | |
| MICHAEL MITCHEFF, | ) | |
| PABLO M. PEREZ, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

In this case filed under 42 U.S.C. § 1983 and the Indiana Constitution, Indiana inmate

Shawn Dotson alleges that Defendants were deliberately indifferent to his serious medical needs

because they unnecessarily pursued conservative treatment of a hip condition rather than

approving hip replacement surgery. Defendants have moved for summary judgment. Dkt. 71.

**I.
Standard of Review**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a

case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no

genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a

matter of law. *Id.*; *Pack v. Middlebury Comm. Schs.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A

"genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving

party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that

might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (cleaned up). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

## II.
## Preliminary Evidentiary Issues

Before discussing the merits of the case, the Court resolves some preliminary evidentiary issues.

Defendants raise several objections to Mr. Dotson's response to their summary-judgment motion. First, they complain that Mr. Dotson failed to support some statements in his "Statement of Material Facts in Dispute" with citations to record evidence. Dkt. 86 at 2–3. Defendants list the statements that they challenge. *Id.* Southern District of Indiana Local Rule 56-1(e) requires that parties "support each fact [they] assert in a brief with a citation to a discovery response, a

deposition, an affidavit, or other admissible evidence . . . The citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." S.D. Ind. L. R. 56-1(e). In addition, the Court is not required to scour the record searching for evidence to support Mr. Dotson's case. *Grant*, 870 F.3d at 573–74. Accordingly, to the extent that any statements in Mr. Dotson's "Statement of Material Facts in Dispute" are not supported by proper record citations, the Court declines to consider them.

Second, Defendants contend that Mr. Dotson's response mischaracterizes record evidence, listing several specific statements to which they object. Dkt. 86 at 3–7. In deciding a summary-judgment motion, the Court is ultimately governed by the actual record evidence—not either party's characterization of it. Thus, to the extent that any of the statements in Mr. Dotson's response brief are not supported by record evidence—or a reasonable inference from record evidence—the Court disregards those statements.

Third, Defendants object to three declarations that Mr. Dotson submitted in support of his summary-judgment response. Dkt. 86 at 10–11. In those affidavits, two correctional officers state that, when they accompanied Mr. Dotson to an outside medical appointment in July 2019, they heard the doctor (who is not a party and was not employed by Wexford) performing an injection say that Mr. Dotson needed surgery. Dkt. 81-8 at 1–2. A third other correctional officer states that, in April 2019, he heard Dr. Sami Jaafar (another non-party, non-Wexford consulting physician) say that Mr. Dotson needed surgery. *Id.* at 3. Defendants object that the statements are inadmissible hearsay. Dkt. 86 at 10–11. The Court agrees. Mr. Dotson is offering the statements for their truth, so they are inadmissible hearsay not covered by any hearsay exception. *See* Fed. R. Evid. 801 (defining hearsay); *Youngman v. Peoria County*, 947 F.3d 1037, 1043 (7th Cir. 2020) (hearsay exception in Fed. R. Evid. 803(4) for statements made in connection with medical treatment or

diagnosis does not apply to statements by a treating physician). Thus, the Court disregards the correctional officers' declarations.

Finally, Defendants argue that the following statement in Mr. Dotson's summary-judgment affidavit should be disregarded because it is not based on personal knowledge and amounts to inadmissible hearsay: "I am being treated for back pain and nerve damage *that medical professionals at Eskenazi believe to be due to my confinement in a wheelchair for the years prior to my surgery.*" Dkt. 86 at 8 (citing 81-2 ¶ 23) (objectionable portion in italics). Defendants' objection is well taken. Mr. Dotson is not qualified to testify as to the cause of his back pain and nerve damage, *see Pearson v. Ramos*, 237 F.3d 881, 885 (7th Cir. 2001) ("Wholly lacking in medical knowledge as he was, the plaintiff was incompetent to testify on the causal relation if any between exercise and health gums."), and, to the extent he relies on statements of non-party medical professionals for the truth of the matter asserted, those statements are inadmissible hearsay that do not fall within any exception, *see* Fed. R. Evid. 801 (defining hearsay); *Youngman*, 947 at 1043 (hearsay exception for statements made in connection with medical treatment or diagnosis does not apply to statements made by treating physicians). Accordingly, the Court does not consider the objectionable statement.

### III.
### Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

4

### A.  The Parties

Mr. Dotson is an inmate in the custody of the IDOC. Dkt. 81-2 ¶ 2. He has no medical training. Plaintiff's Deposition, Dkt. 71-1 at 15.[1]

From April 1, 2017, to June 30, 2021, Wexford maintained a contract with the IDOC to provide medical services to incarcerated individuals. Dkt. 81-9 at 5.

At all times relevant to this lawsuit, Dr. Perez was employed by Wexford as a physician at Putnamville. Dr. Perez Deposition, Dkt. 71-3 at 4–5. Following medical school, Dr. Perez completed a general internship, which included rotations in surgery and orthopedics, but Dr. Perez has never performed a hip surgery or hip replacement. *Id.* at 34.

From July 2018 through June 2021, Dr. Mitcheff was employed by Wexford as the Regional Medical Director in Indiana. Personal Deposition of Dr. Mitcheff, Dkt. 71-2 at 7. Dr. Mitcheff is a Doctor of Osteopathic Medicine. *Id.* at 7–8. His training was "heavy" in orthopedics, kinesiology, and biomechanics. *Id.* Dr. Mitcheff is board certified in family medicine, osteopathic medicine, addiction medicine, and healthcare quality management. *Id.* at 8. During his training, Dr. Mitcheff completed many orthopedic rotations. *Id.* at 8–9. During his time as Regional Medical Director, Dr. Mitcheff was responsible for onboarding new physicians. Part 2 of Plaintiff's Deposition, Dkt. 81-1 at 3, transcript page ("tr. p.") 12.  Dr. Mitcheff is currently employed by Wexford as National Medical Director for Utilization Management and Clinician Services; he is not currently involved with care for inmates in Indiana. Dkt. 71-2. at 5–6.

### B.  Wexford's Process for Evaluating Outpatient-Treatment Requests

Dr. Mitcheff was not personally responsible for Mr. Dotson's care, and he has never examined Mr. Dotson. *Id.* at 15. At all relevant times, Mr. Dotson was primarily treated by medical

---

[1] Citations to depositions are to the page numbers assigned when the document was filed in CM/ECF, not to the original transcript page numbers, except where specifically noted.

providers who worked at the prisons where he was housed. *See generally* dkt. 71-4 (medical records). Under Wexford's Utilization Management Guidelines, an onsite treating provider could generate a "Consultation Request (OPR)" form to request that an inmate be seen by a provider offsite. Dkt. 81-13 at 4. The guidelines state that OPRs are reviewed in a collegial conference call or by the regional medical director or his designee. *Id.* Under the policy, after the collegial review, the OPR is either approved or an alternative treatment plan ("ATP") is recommended. *Id.*

The guidelines provide that, when an OPR is deferred in favor of an ATP, the requesting provider may appeal that decision and sets forth a process for pursuing an appeal. *Id.* at 10. The guidelines provide for multiple levels of appellate review above the regional medical director, starting with the assigned Utilization Management Nurse, another Utilization Management physician, or a Corporate Medical Director and then proceeding to the IDOC's Chief Medical Officer or designee. *Id.* Although the guidelines set out an appeal process, Dr. Perez testified that he was not made aware of the appeal process, and that he thought that Dr. Mitcheff represented the final authority on OPRs. Dkt. 81-14 at 13–19.

On multiple occasions during the time period at issue in this lawsuit, treating physician Dr. Perez concluded that Mr. Dotson might need to see a health provider outside of Putnamville and submitted an OPR. *See generally* dkt. 71-4. Dr. Mitcheff evaluated some of those requests, sometimes after discussing the request in a collegial review session with Dr. Perez and another Wexford physician, Dr. Duan Pierce. Dkt. 71-2 at 36; dkt. 71-3 at 14. Dr. Mitcheff testified that, in evaluating OPRs, he considered the physical examination of the treating physician and prior consultations with specialists. Dkt. 71-2 at 15–16. He testified that not all specialist recommendations are followed. *Id.* at 17. Instead, he testified, he reviews the totality of a specialist

6

consultation, including physical examinations, and then decides whether to follow the recommendation. *Id.*

### C.  Mr. Dotson's Medical Condition and Treatment At Miami Correctional Facility

In December 2017, while Mr. Dotson was incarcerated at Miami Correctional Facility ("Miami"), he presented to a prison medical provider for chronic hip pain. Dkt. 81-3 at 1. At that time, he was in a wheelchair and was told to continue with it for another 60 days while going through physical therapy. *Id.* at 2. In February 2018, Dr. Kuenzli approved a request for an orthopedics consult. Dkt. 81-9 at 4. In the OPR records, there is a reference to a pre-incarceration, 2013 note from Ortho Indy saying that there "wasn't much left to consider other than total hip arthroplasty because [Mr. Dotson wasn't] doing well even after arthroscopic debridement of the torn labrum and chondroplasty of cartilage damage. It looks like injections . . . made [Mr. Dotson] worse." *Id.*

On February 28, 2018, when Mr. Dotson was 38 years old, he was seen by orthopedic specialist Dr. John Manalo at Fort Wayne Orthopedics. Dkt. 81-6 at 1. At the time, Mr. Dotson was using a wheelchair. *Id.* Dr. Manalo ordered X-rays of Mr. Dotson's left hip, which showed sequelae of Perthes disease with a dysmorphic femoral head. *Id.* at 2. Dr. Manalo recommended an MRI to rule out a labrum tear. *Id.* Mr. Dotson had an MRI, and—on July 9, 2018—Dr. Manalo noted that Mr. Dotson's MRI showed degenerative tearing of the labrum with cartilage thinning consistent with arthritis of the left hip. *Id.* at 7. Dr. Manalo noted that Mr. Dotson might one day benefit from an elective total joint replacement but that he had not yet exhausted conservative treatment modalities. *Id.* He recommended non-steroidal anti-inflammatories, physical therapy, activity modification, and a left hip corticosteroid injection. *Id.* at 8. On August 9, 2018, Mr. Dotson had a left hip injection of lidocaine and Kenalog. *Id.*

Mr. Dotson also participated in physical therapy at Miami from December 28, 2017, to March 15, 2018, and again from September 6, 2018, to February 5, 2019. Dkt. 81-4 at 118–130. Mr. Dotson's physical therapist testified that, with physical therapy, he was trying to increase Mr. Dotson's strength and range of motion. Deposition of Nathan Bates, Dkt. 71-10 at 4–5. He also testified that building strength could improve function, increase the chance of any surgery being successful, and help Mr. Dotson maintain muscle mass in his lower extremities. *Id.* at 4–6.  As part of physical therapy, Mr. Dotson was expected to continue doing strength training exercises on his own. *Id.* at 9.

By November 27, 2018, Mr. Dotson was still rating his left hip and leg pain as 7-to-8 out of 10 and was using a wheelchair for all forms of mobility. Dkt. 81-1 at 2. He had been undergoing physical therapy and was following a home-exercise program. *Id*. He was compliant with his home-exercise program, but he told his physical therapist that it did not help and that his hip pain was not getting any better. *Id*. In a November 27, 2018, treatment note, his physical therapist noted, "Offender is being discharged due to lack of progress with conservative PT treatment. From a PT perspective, there is nothing more I can do for him." *Id*. The physical therapist referred him back to the provider. *Id.*

On December 2, 2018, Mr. Dotson submitted a request for health care and asked what other conservative measures he needed to complete before he could be eligible for surgery. Dkt. 81-1 at 4. The facility told Mr. Dotson to continue with the exercise regimen given by the physical therapist and advised that he would be scheduled for a follow-up appointment with a provider. *Id*.

Dr. Mitcheff reviewed Mr. Dotson's situation, and—on December 14, 2018—the following note was generated to Mr. Dotson's record:

> 12-14-18 request for ortho follow up reviewed by Dr. Mitcheff for Pt with degenerative hip disease and arthritis, does not walk on LLE due to pain. Calf

8

muscle is 2.5 inches less in diameter than R. He has been through conservative treatments such as pain meds, PT, W/C, and US guided steroidal inj but there has been no improvement in function or pain relief. ATP—NEEDS WEIGHT LOSS/CONTINUE PT AND PROVIDE [HOME EXERCISE PLAN] FOR ROM, TREAT WITH PAIN MEDS PRN. Case Resolved re-present as clinically necessary.

*Id.* at 5.

Mr. Dotson began his third round of physical therapy on February 5, 2019. *Id.* at 6. The

physical therapist made this note from the visit:

Pt is well aware of PT HEP exercises/stretches and notes compliance with his routine since his most recent PT discharge on 11/27/2018. He is currently wheelchair bound with noticeable muscle atrophy in his L quad and L gastric muscles . . . . He is able to perform all his own ADLs and daily functional tasks from his wheelchair at this time. From a PT perspective, there is nothing more that I can offer this patient and pt understands.

*Id*.

### D.  Transfer to Putnamville and Consultation with Dr. Jaafar

Mr. Dotson was transferred from Miami to Putnamville in March 2019. Dkt. 81-3 at 4.

At the time, he was wheelchair dependent. *Id.* at 5. Mr. Dotson first met with Dr. Perez on

March 27, 2019. Dkt. 71-4 at 1–2. Dr. Perez noted that Mr. Dotson had previously completed

steroid injections and physical therapy and that Mr. Dotson had continuing atrophy to his left quad

and calves. *Id.* Dr. Perez then submitted an OPR for an orthopedic consultation, writing that pain

medications were not helping much at all and that Mr. Dotson continued to lose muscle mass.

*Id.* at 5. The request was approved by Dr. Pierce. *Id.* at 113.

On April 9, 2019, Mr. Dotson saw Dr. Sami Jaafar at Union Health in Terre Haute. *Id.* at

153–54. Dr. Jaafar did a physical evaluation of Mr. Dotson's leg and mobility. *Id*. He also ordered

X-rays. *Id*. Dr. Jaafar indicated that he believed a hip replacement was necessary but that "this

[could] be done once he is out of jail or to the discretion of the jail[.]" *Id.* at 154. Dr. Jaafar also

referred Mr. Dotson to his colleague Dr. Stephen Fern. Deposition of Dr. Fern, Dkt. 71-6 at 9.

Dr. Jaafar expected Dr. Fern to reach his own conclusion about Mr. Dotson's condition. Dkt. 71-5 at 4. Dr. Jafaar is an orthopedic surgeon and has completed many hip replacements, but he testified that Dr. Fern was more specialized in completing hip replacements for dysplastic hips and malformed hips. *Id.* at 11–12.

On April 10, 2019, Dr. Perez submitted an outpatient-treatment request for a hip replacement, noting that Dr. Jaafar was referring Mr. Dotson to Dr. Fern or Dr. Belmar for a total left hip replacement. Dkt. 71-4 at 7–9. Dr. Pierce approved Mr. Dotson for an orthopedic consult with Dr. Fern or Dr. Belmar. *Id.* at 111.[2]

On May 7, 2019, Mr. Dotson met with Dr. Perez again. Dkt. 81-1 at 10. Dr. Perez noted that Mr. Dotson had weak hip muscles and severely decreased range of motion. *Id.* at 11.

### E.  Consultation with and Treatment by Dr. Fern

On May 30, 2019, Mr. Dotson saw Dr. Fern, who is an orthopedic surgeon. *Id.* at 12–13. Dr. Fern understood that Dr. Jaafar was seeking a second opinion about Mr. Dotson. Dkt. 71-6 at 10. Dr. Fern examined Mr. Dotson and found that he was "much too tender on the anterior and lateral portion of the hip, which [was] not consistent with intra-articular pathology." Dkt. 81-1 at 13. He also noted no bone-on-bone arthritis. *Id*. At his deposition, Dr. Fern noted that

> people with true intra-articular pathology, really severe hips, worn out avascular necrosis, these kinds of problems, actually often don't have any tenderness around the hip when you push on their skin, when you push on the lateral hip; they're not

---

[2] Mr. Dotson insists throughout his response brief that the request for a hip replacement was approved in April 2019, apparently based on the fact that the request form has a section that says, "Criteria Met: Yes" and an email from an administrative assistant stating, "This was approved," in response to  an email about the OPR. Dkt. 82 at 8 (citing dkts. 81-16 through 81-18). But other portions of the record clearly show that, after Dr. Pierce reviewed the request, Mr. Dotson was approved only for an orthopedic consult. *See, e.g.*, dkt. 71-4 at 111 ("5-6-19 Orthopaedic Surgeon Consult approved by Dr. Pierce for 39 yo male with hx of Perthes D[i]sease . . . . "). No reasonable jury could infer from the "Criteria Met: Yes" section on the OPR form or the administrative assistant's email that Mr. Dotson had been approved for a hip replacement.

tender per se. They're—you just don't have tenderness that commonly with those things.

Dkt. 71-6 at 17.

He also testified that, for a patient requesting a hip replacement, he would not expect tenderness on the anterior and lateral portion of the hip. *Id.* He explained that, if the true source of Mr. Dotson's pain was his hip joint, Mr. Dotson's previous injections would have offered pain relief. *Id.* at 17–18. Because they did not, Dr. Fern testified that he considered the possibility that the hip joint was not the source of Mr. Dotson's pain. *Id.* at 18. He also testified that patients who have gone to hip replacement often have severe degenerative changes of their hip joint. *Id.* at 18−19.

After the appointment, Dr. Fern recommended a steroid injection for Mr. Dotson. In his summary of the appointment, he wrote:

> I am not convinced his hip joint is the true cause of his discomfort[. H]e is much too tender on the anterior and lateral portion of the hip which is not consistent with intra-articular pathology. I'm also concerned that he had a previous intra-articular injection and got no relief from it[. T]hat certainly points away from the hip joint as the true source of discomfort. His x-rays do reveal Perthes's disease but certainly not bone-on-bone arthritis. There is also question of secondary gain issues which makes this more difficult.
>
> I would like to try another steroid injection in the left hip to see what type of pain relief he gets from this. He also reports having a left hip MR arthrogram in September at Regional that we will try to get a copy of to further evaluate. Shawn was interested in left hip replacement but at this time I do not believe the procedure [is] indicated and would like to try the aforementioned steps first.

Dkt. 71-4 at 156.

On June 13, 2019, Dr. Perez submitted an OPR for a follow-up orthopedic consultation appointment with Dr. Fern. *Id.* at 10–11. Dr. Mitcheff "ATP'd" the request, meaning that he denied the request in favor of an alternative treatment plan, namely, conservative care. *Id.* at 109.

On June 25, 2019, Mr. Dotson saw Dr. Perez, and Mr. Dotson complained that his hip continued to bother him. Dkt. 71-4 at 12–14. In his treatment note for the visit, Dr. Perez wrote, "Steroid injection was ATP'd and recommended conservative onsite treatment first. We have done this in the past and did not help. Physical therapist said that he cannot do anything to help this OFD." *Id.* at 12. After the appointment, Dr. Perez submitted another OPR and sought a follow-up appointment with Dr. Fern for steroid injections. *Id.* at 15–17. Dr. Mitcheff approved the request. *Id.* at 110. Mr. Dotson had a steroid injection on July 18, 2019. *Id.* at 108.

On July 24, 2019, Mr. Dotson saw Dr. Perez for a post-injection appointment. *Id.* at 19−20. Dr. Perez prescribed Ultram to Mr. Dotson. *Id.* He also submitted an OPR for a follow-up appointment with Dr. Fern, noting that Mr. Dotson was in more pain following the steroid injection. *Id.* at 21–23. He noted that Mr. Dotson said he had been told that he needed surgery but that no official report stated this. *Id.* Dr. Perez stated that he thought Mr. Dotson needed a hip replacement, but he noted that he was not in orthopedics. *Id.* Dr. Pierce approved the request for a follow-up visit with Dr. Fern after collegial discussion with Dr. Perez. *Id.* at 108.

Mr. Dotson saw Dr. Fern again on August 20, 2019. *Id.* at 157–58. At this appointment, Mr. Dotson reported that the injection had provided no pain relief. *Id.* Dr. Fern offered the following assessment in his summary of the appointment:

> If he had profound relief from the injection then I would feel much more comfortable that the hip was a true source of discomfort and feel better about a hip replacement even someone in his young age bracket.
>
> Again, I am not convinced his hip joint is the true cause of his discomfort and further the intra-articular injection provided 0 relief which in my opinion certainly points away from the hip joint as the true source of discomfort. His x-rays do reveal Perthes's disease but certainly not bone-on-bone arthritis. There is also question of secondary gain issues which makes this more difficult.

He may do well with a hip replacement[.] I am not convinced. I would recommend that he return to the previous physicians Dr. Scheid and Dr. Lintner and OrthoIndy for continued care.

*Id.* at 158.

At his deposition, Dr. Fern testified that he considered Mr. Dotson's complaints to be nonemergent. Dkt. 71-6 at 34. Dr. Fern testified that he could have prescribed Mr. Dotson pain medications but did not because he considered that pain management was outside the scope of what he provides as an orthopedic surgeon. *Id.* at 35–38. Dr. Fern testified that, after ending his care of Mr. Dotson, he was not surprised to learn that Mr. Dotson went through about two more years of conservative care because a hip replacement surgery for a 39-year-old is "not something you want to jump into unless you're as convinced as you can be that it's the right thing to do for the patient." *Id.* at 4. Dr. Fern testified that he would assume that "the other medical team that was working with [Mr. Dotson] agreed that it probably wasn't the right thing to consider hip replacement, and maybe encouraged him to continue with those conservative measures." *Id.*

On August 27, 2019, Dr. Perez submitted an OPR for an orthopedic follow-up, noting that Dr. Fern was not "well convinced" that Mr. Dotson would do well with a hip replacement. Dkt. 71-4 at 26–28. Dr. Perez noted that Dr. Fern recommended sending Mr. Dotson to his previous physicians at other orthopedic groups and that he—Dr. Perez—personally believed that the hip should be replaced. *Id.* Dr. Mitcheff ATP'd the request for additional orthopedic follow-up in favor of conservative care with a home-exercise routine to increase Mr. Dotson's range of motion. *Id.* at 102. Dr. Mitcheff also suggested that Mr. Dotson could participate in physical therapy for strength training. *Id.*

At his deposition, Dr. Mitcheff testified that, when reviewing Dr. Fern's note, Dr. Mitcheff agreed that "if you do an injection on the hip joint and get no relief, it's not likely that you're going to have a great outcome from the surgical procedure because it's probably not going to eliminate

your pain." Dkt. 71-1 at 25. He also testified that, in his opinion, the amount of pain in Mr. Dotson's joint was not consistent with Perthes disease or any dysmorphia of the hip. *Id.* at 36. Also, Dr. Mitcheff testified, he wanted Mr. Dotson to increase muscle tone and strength before having surgery. *Id.* at 25. He testified that he understood that Mr. Dotson would eventually need a hip replacement but that he wanted Mr. Dotson "to be in the best condition he could possibly be in prior to that[.]" *Id.* at 27. He also testified that, in his opinion, typically, hip replacements are held off until there is significant bone-on-bone damage. *Id.* at 28. He testified that, in his experience, repetitively exercising muscle groups will increase muscle mass and increase muscle tone. *Id.* at 30.

After Dr. Mitcheff ATP'd the request for a follow-up orthopedic consultation, Mr. Dotson was provided with a list of exercises that he could perform in the prison's gym. Dkt. 71-1 at 14. On September 3, 2019, Mr. Dotson saw Dr. Perez again to discuss the denial of the request for an orthopedic follow-up and the alternative treatment plan. Dkt. 71-4 at 32–33. Dr. Perez noted that he did not know how to treat Mr. Dotson conservatively and would submit another OPR for reconsideration. *Id.*

Mr. Dotson saw Dr. Perez again on September 30, 2019. *Id.* at 34–35. Mr. Dotson reported concerns that he would never walk again, and Dr. Perez prescribed Mobic for pain. *Id.* Dr. Perez also submitted another OPR for an orthopedic appointment, noting that Mr. Dotson reported increased pain and muscle wasting in the upper left thigh and hip. *Id.* at 103. Dr. Perez noted that Mr. Dotson was concerned about losing the ability to walk. *Id.* Dr. Mitcheff ATP'd the request for an additional off-site orthopedic consultation in favor of continued onsite conservative care. *Id.* Dr. Mitcheff suggested a home exercise program to work on range of motion and physical therapy for strength training. *Id.*

14

On October 15, 2019, Mr. Dotson saw Dr. Perez to discuss the latest denial and alternative treatment plan. *Id.* at 36–37. Mr. Dotson stated that he did not want to participate in any additional physical therapy. *Id*. Dr. Perez noted that Mr. Dotson's Mobic would be continued and that he would reconsider physical therapy and consider an additional OPR. *Id.*

On October 16, 2019, Wexford Director of Nursing Susan Moothery emailed Dr. Mitcheff and Dr. Pierce, stating that Mr. Dotson was losing weight. Dkt. 81-16 at 1.  She stated, "Dr. Perez has expressed concern regarding the ATP due to states that he really feels that this offender needs this consult." *Id*. She asked for suggestions as to how to treat Mr. Dotson conservatively. *Id.* Later in the day, she emailed Dr. Mitcheff again explaining that Dr. Perez was concerned about Mr. Dotson's weight loss and wanted to know how to treat him conservatively. *Id.* at 2. Dr. Mitcheff responded, "What does the weight loss have to do with his hip? I would work up the weight loss." *Id*. Nurse Moothery replied, "In the notes it states that there is a concern that the weight loss is related to the muscle wasting noted in the offender's hip/thighs. The offender is wheelchair bound at this time." *Id*.

### F.  November 2019 Injury

Mr. Dotson saw a nurse on November 10, 2019, after he reported that he fell while transferring from his wheelchair to his bed and landed on his hip. Dkt. 71-4 at 39–41. Mr. Dotson was prescribed Torodal, and hip X-rays were ordered. *Id*. While X-ray results were pending, a nurse became concerned that Mr. Dotson's hip was dislocated, so a nurse practitioner and the director of nursing approved his transport to a hospital by ambulance. *Id.* at 42–43. Hospital staff performed a CT scan and noted that Mr. Dotson had a hip contusion. *Id.* at 51.

Mr. Dotson returned to Putnamville the next day. *Id.* at 44–50. He was placed in a medical observation cell in the prison's infirmary. *Id*. He was also prescribed cyclobenzaprine, Mobic, and

Ultram for pain. *Id.* at 51–52. He was discharged from the infirmary after two days—on November 13, 2019. *Id.* at 69–70.

Mr. Dotson saw a nurse on December 5, 2019, and discussed his hip pain. *Id.* at 29–31. At the visit, Mr. Dotson noted that he was having additional problems following his recent fall and asked about physical therapy. *Id*.

On January 21, 2020, Dr. Perez submitted an OPR request for an orthopedics consultation and for reconsideration of surgery, stating, "He is losing muscle mass left lower extremity. He was doing HEP on his own in the dorm and now is doing it at the rec and being supervised. Asking for reconsideration about the surgery." *Id.* at 74–75 (original all-caps omitted). Dr. Mitcheff ATP'd the request in favor of continued onsite conservative treatment. *Id.* at 103. He indicated that he reviewed the orthopedic notes from Dr. Fern, which indicated that Dr. Fern was not convinced that Mr. Dotson would do well with surgery and the hip was likely not the cause of Mr. Dotson's pain. *Id*. At his deposition, Dr. Perez testified that believed that, if Mr. Dotson were diligent, the home exercise program would have helped him maintain muscle mass. Dkt. 71-3 at 32–33. The home exercise program did not require supervision from a medical professional. *Id*.

Mr. Dotson saw Dr. Perez again on March 10, 2020. Dkt. 71-4 at 82–83. Dr. Perez's treatment note indicates that Mr. Dotson was still reporting the same complaints and problems with his left hip. *Id.*

### G.  Transfer to New Castle, Referral to Indianapolis Specialist, and Surgery

Mr. Dotson was transferred to New Castle on April 13, 2020. *Id.* at 84–89. He saw nurse practitioner Dianna M. Johnson on April 23, 2020, complained of piercing and sharp pain in his left hip, and requested an orthopedics referral. *Id.* at 90–92. At the time he was not able to walk. *Id.* He was told that doctors were not accepting patients due to the COVID-19 pandemic. *Id*.

On June 10, 2020, Nurse Practitioner Johnson submitted an OPR for an orthopedics referral for Mr. Dotson. *Id.* at 93–95. Dr. Mitcheff approved the request. *Id.* at 104.

Staff tried to schedule an appointment with Hancock Ortho in Aril 2020, but those physicians declined to see Mr. Dotson. *Id.* at 96. They were later able to obtain an appointment with Eskenazi Ortho on December 1, 2020. *Id.* at 96, 159–68.

Mr. Dotson saw Dr. Jason Watters at Eskenazi on December 1, 2020. *Id.* at 159–68. At his deposition, Dr. Watters testified that he believed that Mr. Dotson's case was complex because of the deformity to the femoral head and neck from Perthes disease. Deposition of Dr. Watters, Dkt. 71-7 at 4–5. He testified that he believed that Mr. Dotson was a candidate for a hip replacement because of the structural problems in his hip, his limitations with mobility, and his pain level. *Id.* at 8–9. He testified that, for Mr. Dotson's case, he would expect to see conservative treatment measures before surgery, including mediation, injections, and assistive devices. *Id.* at 15. He testified that Mr. Dotson's case did not present an emergency situation. *Id.* at 27–28.

Because Dr. Watters recommended a hip replacement, Dr. Erik Falconer placed an OPR for a total left hip replacement. Dkt. 71-4 at 99–101. Dr. Mitcheff approved he request on December 22, 2020. *Id.* at 102. Because of pandemic-related restrictions, the surgery did not happen until June 3, 2021. Dkt. 71-7 at 19–20.

## IV.
### Discussion

### A.  Dr. Perez

In a footnote, Mr. Dotson concedes that Dr. Perez was not deliberately indifferent to Mr. Dotson's serious medical needs and states that he will not pursue this matter against Dr. Perez. Accordingly, Defendants' motion for summary judgment is **granted** as to Dr. Perez, and Mr. Dotson's claims against him are **dismissed**.

17

### B. Eighth Amendment Claims

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

Wexford does not dispute that Mr. Dotson's hip condition was a serious medical need. *See generally* dkt. 72. To survive summary judgment then, Mr. Dotson must show that Dr. Mitcheff acted with deliberate indifference—that is, that he consciously disregarded a serious risk to Mr. Dotson's health. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Mr. Dotson "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Id*. "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted). A finding of deliberate indifference may be based on evidence that a physician "persist[ed] with a course of treatment that he [knew would] be ineffective," as well as evidence that a physician's a "treatment decision was so far afield of

accepted professional standards that a jury could find it was not the product of medical judgment." *Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017) (cleaned up). But where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently. *Dean*, 18 F.4th at 241–42.

Deliberate indifference can include an "intentional delay in access to medical care." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). "A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Id.* Even when a medical professional provides some treatment, his actions "may reflect deliberate indifference if he chooses an easier and less efficacious treatment without exercising professional judgment." *Id.* (cleaned up). In addition, a prison physician "cannot simply continue with a course of treatment that he knows is ineffective in treating the inmate's condition." *Id.* "A physician's decision to persist with ineffective treatment and ignore a patient's repeated complaints of unresolved pain and other symptoms can give rise to liability—or, at the very least, raise enough questions to warrant a jury trial." *Goodloe v. Sood*, 947 F.3d 1026, 1027-28 (7th Cir. 2020).

### 1. Dr. Mitcheff

Mr. Dotson argues that Dr. Mitcheff was deliberately indifferent to his serious medical needs because Dr. Mitcheff persisted with conservative treatment for more than two years even though he knew that conservative treatment was ineffective. Dkt. 82 at 20. Dr. Mitcheff contends that he was not deliberately indifferent, his decision to pursue conservative care was reasonable, and he reasonably relied on the evaluations of other medical professionals, particularly Dr. Fern. Dkt. 72 at 29–30.

The Court concludes that disputed issues of material fact exist as to Dr. Mitcheff's state of mind at least as of August 29, 2019. The record includes ample evidence showing that, starting in at least December 2017, Mr. Dotson was using a wheelchair and consistently complaining of hip pain that did not improve with injections or repeated courses of physical therapy and home exercise programs. Dr. Mitcheff knew that Mr. Dotson would eventually need a hip replacement. As of August 2019, Dr. Mitcheff knew that Dr. Jaafar was recommending a hip replacement and that Dr. Fern was recommending that Mr. Dotson be referred to his previous treating orthopedic specialists. Rather than approving Dr. Perez's request for a referral, Dr. Mitcheff ATP'd the request and directed that Mr. Dotson continue with conserve treatment, which had not relieved his pain in the past. Over the course of the next 10 months, Dr. Mitcheff denied two more of Dr. Perez's requests for an orthopedics referral, even though Dr. Perez told him that Mr. Dotson had increasing pain and muscle wasting and Dr. Perez indicated that he did not know how to treat Mr. Dotson conservatively. A reasonable jury could find from this evidence that Dr. Mitcheff knew that conservative treatment was ineffective but persisted with that course for close to a year rather than refer Mr. Dotson to another orthopedic surgeon, as Dr. Fern had recommended. And a reasonable jury could conclude from these findings that Dr. Mitcheff was deliberately indifferent to Mr. Dotson's serious medical needs. *See, e.g.*, *Berry v. Peterman*, 604 F.3d 435, 441–42 (7th Cir. 2010) (finding fact issue as to deliberate indifference where doctor persisted with easier course of treatment for dental pain over several weeks and ignored obvious alternative of referring inmate to dentist).

Dr. Mitcheff argues that he was not deliberately indifferent, relying on his own testimony that he delayed making the referral because he thought that Mr. Dotson would have a better chance of a successful surgical outcome if he built muscle strength and range of motion first. Dkt. 72 at

29–30. This testimony does not explain why Dr. Mitcheff waited so long to follow Dr. Fern's recommendation to refer Mr. Dotson to another orthopedic surgeon. Regardless, the record evidence also supports an inference that Dr. Mitcheff knew that continuing with conservative care was ineffective, and—based on that evidence—a reasonable jury could choose not to credit Dr. Mitcheff's explanation. The Court cannot make such credibility determinations at summary judgment. *See Miller*, 761 F.3d at 827.

Dr. Mitcheff also highlights the testimony of Mr. Dotson's treating orthopedic physicians, who testified that it is common to pursue conservative treatment before surgery, that Mr. Dotson's condition was not emergent, and that it is best to put off hip replacement surgery as long as possible. Dkt. 72 at 29–30. A jury might rely on such evidence to find in Dr. Mitcheff's favor at trial, but, as explained above, it might also focus on other evidence and find that Dr. Mitcheff knowingly pursued an ineffective course of treatment.

Likewise, Dr. Mitcheff claims that Dr. Fern testified that it was not unreasonable for Dr. Mitcheff to have continued conservative care for Mr. Dotson for two years after Dr. Fern last saw him. Dkt. 86 at 12–13. Mr. Dotson's characterization of Dr. Fern's testimony is incorrect. Dr. Fern did not testify that Dr. Mitcheff's course of care was reasonable. Instead, he testified only that he was "not surprised" that conservative care continued for two years after he last saw Mr. Dotson because he assumed that "the other medical team that was working with [Mr. Dotson] agreed that it probably wasn't the right thing to consider hip replacement, and maybe encouraged him to continue with those conservative measures." Dkt. 71-6 at 4.  But, as explained, a reasonable jury could conclude that Dr. Mitcheff knew that the course of conservative care was not working and persisted with it for 10 months after Mr. Dotson last saw Dr. Fern.

For these reasons, Dr. Mitcheff is not entitled to summary judgment in his favor, and Defendants' motion for summary judgment is **denied** as to Mr. Dotson's Eighth Amendment claims again Dr. Mitcheff.

### 2. Wexford

Because Wexford acted under color of state law by contracting to perform a government function—providing healthcare services to inmates—it is treated as a government entity for purposes of 42 U.S.C. § 1983 claims. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2019). Therefore, a claim against Wexford must be based on a policy, practice, or custom that caused a constitutional violation. *Id.*; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). To prevail on such a claim, "a plaintiff must ultimately prove three elements: (1) an action pursuant to a municipal [or corporate] policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal [or corporate] action was the 'moving force' behind the constitutional injury." *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020).

A plaintiff may establish the first element in three ways. First, the plaintiff may show that the alleged unconstitutional conduct implements or executes an official policy adopted by the corporation's officers. *Thomas v. Martija*, 991 F.3d 763, 773 (7th Cir. 2021) (citing *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978)). Second, the plaintiff may show that the unconstitutional action was done pursuant to a widespread custom, even one that is not formally codified. *Id.* Third, the plaintiff may prove that an actor with final policymaking authority within the entity adopted the relevant policy or custom. *Id.*

Mr. Dotson makes only one argument as to the first element—namely, that Dr. Mitcheff acted as a final policymaker every time he denied an OPR for follow-up care for Mr. Dotson.[3] Dkt. 82 at 31–34. Mr. Dotson acknowledges that Wexford maintained an appeal process by which Dr. Perez could have appealed any of Dr. Mitcheff's denials but notes that, at his deposition, Dr. Perez said he was unaware of any appeal process and that, as far as he knew, Dr. Mitcheff's decision was final. *Id.* at 31. Mr. Dotson then blames Dr. Perez's lack of knowledge on Dr. Mitcheff because Dr. Mitcheff was responsible for onboarding new hires. *Id.* Mr. Dotson also relies on Dr. Mitcheff's deposition testimony to the effect that he was "the" representative between Wexford and the IDOC. *Id.* at 32 (citing dkt. 81-12 at 5). Finally, Mr. Dotson points to emails that, he says, show that the IDOC "utterly deferred" to Dr. Mitcheff. *Id.* (citing dkts. 81-16 through 81-18). Based on this evidence, he argues that the "buck stopped" with Dr. Mitcheff, making him a final policymaker or decisionmaker for purposes of a *Monell* claim. *Id.*

*Monell* liability may be imposed under the policymaking theory if a plaintiff introduces "evidence that an official with final policy-making authority acted for the corporation." *Whiting v.*

---

[3] In a footnote, Mr. Dotson states that the "record supports a second possible *Monell* claim: it is clear that Mr. Dotson's surgery was approved in April of 2019 . . . , but poor documentation and communication and/or an undue concentration of authority in one person (i.e. Dr. Mitcheff) allowed the approval to slip through the cracks, resulting in Mr. Dotson suffering unnecessarily for more than two years." Dkt. 82 at 35 n.11. As explained above, *supra* n.2, no record evidence supports a reasonable inference that Mr. Dotson was approved for surgery in April 2019. Regardless, this argument is undeveloped, and the Court considers it waived. *See Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013) ("a party can waive an argument by presenting it only in an undeveloped footnote").

Elsewhere in his response brief, in the course of making his policymaker argument, Mr. Dotson also mentions that Dr. Mitcheff's actions were not an "isolated event" and establish a "clear pattern of behavior" by Dr. Mitcheff. Dkt. 82 at 34. The Court does not understand Mr. Dotson to be relying on the "widespread custom or pattern" theory of *Monell* liability. To the extent that he is, any such attempt fails because Mr. Dotson has not designated any evidence showing that other inmates were injured by the alleged widespread custom or pattern. *See Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 617 (7th Cir. 2022) ("To establish deliberate indifference to the purportedly unconstitutional effects of a widespread practice, Stockton must point to other inmates injured by that practice.").

*Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016) (cleaned up). To prevail under this theory, a plaintiff must prove that "an actor with final decision-making authority within the entity adopted the relevant policy or custom." *Thomas v. Martija*, 991 F.3d 763, 774 (7th Cir. 2019). A court's "inquiry is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker in a particular area, or on a particular issue." *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009) (internal quotation marks omitted). "[S]imply because a municipal employee has decisionmaking authority, even unreviewed authority, with respect to a particular matter does not render him a policymaker as to that matter." *Ball v. City of Indianapolis*, 760 F.3d 636, 643 (7th Cir. 2014). Rather, "[a] municipality must have delegated authority to the individual to make policy on its behalf." *Id.* "Whether a public official has final policymaking authority often turns on whether his decisions are subject to review by a higher official or other authority." *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011). To determine whether an individual has "policymaking authority on any particular policy decision," a court should consider "(1) lack of constraints by policies made by others; (2) lack of meaningful review; and (3) a grant of authority to make the policy decision." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 468 (7th Cir. 2010) (internal quotation marks, brackets, and emphasis omitted).

Mr. Dotson has not designated evidence from which a reasonable jury could conclude that Dr. Mitcheff acted as a final policymaker or decisionmaker for Wexford when he denied Dr. Perez's requests for outpatient treatment for Mr. Dotson. It is questionable whether the kinds of day-to-day decisions Dr. Mitcheff  was making about OPRs rise to the level of policymaking decisions. *See Gernetzke v. Kenosha Unified Sch. Dist. No. 1,* 274 F.3d 464, 469 (7th Cir. 2001) ("Every public employee, including the policeman on the beat and the teacher in the public school,

exercises authority ultimately delegated to him or her by their public employer's supreme governing organs . . . . [But] if a police department or school district were liable for employees' actions that it authorized but did not direct, we would be back in the world of respondeat superior."); *see also Awalt v. Marketti*, 74 F. Supp. 3d 909, 934–35 (N.D. Ill.), *supplemented,* 75 F. Supp. 3d 777 (N.D. Ill. 2014) (concluding that nurse was not a policymaker for *Monell* purposes because her decisions about how to handle detainee grievances and treat detainee medical conditions were not policymaking decisions but discrete exercises of discretion that nearly all professionals make every day).

Regardless, is undisputed that Dr. Mitcheff was subject to Wexford's Utilization Management Guidelines and that Wexford had a multi-layered appeal process in place. And Mr. Dotson has not designated evidence showing that Wexford ever explicitly or implicitly granted Dr. Mitcheff authority to make final decisions about medical decisions generally or OPRs specifically. To the contrary, the existence of the appeal process affirmatively underscores that Wexford did *not* ever grant him such authority.

The fact that Dr. Mitcheff was the sole representative between Wexford and the IDOC does not suggest that he had been given unchecked authority to grant or deny OPRs. And even if Mr. Dotson had come forward with evidence suggesting that the IDOC "utterly deferred" to Dr. Mitcheff—which he has not done[4]—he has not come forward with evidence showing that Dr. Mitcheff's authority was unchecked *within Wexford*. To the contrary, the Utilization

---

[4]On this point, Mr. Dotson relies on two email chains, which were not even generated in the context of an appeal. Dkt. 82 at 32 (citing dkts. 81-16 through 81-18). Instead, it appears that—on one occasion—someone named "Michelle" called the IDOC and asked why Mr. Dotson's hip surgery had been denied, the IDOC asked Dr. Mitcheff about the case, and Dr. Mitcheff responded. Dkt. 81-16 at 3–4. It also appears that—on one other occasion—Wexford and the IDOC coordinated on a response to a complaint the ACLU made on Mr. Dotson's behalf. Dkt. 81-18. No reasonable jury could infer from these email chains that the IDOC generally "utterly deferred" to Dr. Mitcheff or that Dr. Mitcheff's OPR decisions were not subject to meaningful review.

Management Guidelines appeal process shows that multiple people within Wexford had the authority to overrule his decisions about OPRs.

Dr. Perez's testimony about the appeal process also does not support a reasonable inference that Dr. Mitcheff was a final decisionmaker or policymaker for *Monell* purposes. The extent of his testimony on this point is as follows:

Q: [I]f one of your requests is denied, is there any process for you to appeal that?

\*\*\*

A: [I] really don't have any other place to appeal it. Dr. Mitcheff is the only . . . one I . . . know that will approve or not the—[outpatient-treatment request].

\*\*\*

Q: Are you familiar with the utilization management appeal process?

\*\*\*

A: Not—I'm not really very familiar with that.

\*\*\*

Q: Have you ever seen this document [the utilization management policy]?

A: I cannot tell for sure . . . . I don't remember seeing it, but it doesn't mean I did not see it, but no.

\*\*\*

Q: So are you aware of this appeal process?

\*\*\*

A: I was not really aware of this.

Dkt. 71-3 at 28–31.

This testimony is too slender a thread to support a reasonable inference that the appeal process did not exist or that Wexford effectively made Dr. Mitcheff a final decisionmaker.

Mr. Dotson blames Dr. Perez's lack of familiarity with the policy on Dr. Mitcheff—who was responsible for onboarding new hires—but no record evidence supports that inference.

Ultimately, to succeed on a policymaker theory under *Monell*, Mr. Doston must designate evidence from which a reasonable jury could conclude that Wexford had delegated final authority to Dr. Mitcheff to approve or deny OPRs. He has not done so. *Compare Mandel v. Doe*, 888 F.2d 783, 794 (11th Cir. 1989) (affirming district court conclusion that physician assistant acted as a final policymaker where evidence showed that, in practice, physician assistant's "medical decisions were subject to no supervision or review, except to the extent that [the physician assistant] himself, in his sole and unsupervised discretion, deemed appropriate"). Accordingly, Defendants' motion for summary judgment is **granted** as to Wexford, and the Eighth Amendment claims against it are **dismissed**.

### C.  Claims Under Indiana Constitution

At screening, Mr. Dotson was allowed to proceed with claims against Defendants under the Indiana Constitution. Defendants move for summary judgment on those claims, arguing that Mr. Dotson cannot recover money damages under the Indiana Constitution and that any claims for injunctive relief are moot. Dkt. 72 at 21–23. In response, Mr. Dotson concedes that he cannot recover money damages under the Indiana Constitution but argues that this claim survived because he can still obtain declaratory relief. Dkt. 82 at 35. In reply, Defendants argue that Mr. Dotson cannot not obtain declaratory relief because he did not plead it in his complaint and, in any event, there is no longer a live case or controversy between the parties to support a claim for declaratory relief. Dkt. 86 at 17.

The Court agrees that there is no longer a live case or controversy between the parties under the Indiana Constitution. Mr. Dotson cannot obtain money damages, and any claim for injunctive

relief is moot because Wexford is no longer the medical-care provider for the IDOC, so neither Wexford nor Dr. Mitcheff (who still works for Wexford) can provide him with any relief on that front. That leaves his newly raised claim for declaratory relief, but that claim fails for the same reason the claim for injunctive relief fails—neither Wexford nor Dr. Mitcheff is involved with Mr. Dotson's medical care, so a declaratory judgment cannot affect their behavior toward him. *See Pearson v. Welborn*, 471 F.3d 732, 743 (7th Cir. 2006) (affirming district court's refusal to enter declaratory judgment and stating, "[O]nce Pearson was transferred, his prayer for declaratory relief largely dropped out of the picture . . . . Because Pearson has already been transferred, a declaratory judgment would not affect Welborn's behavior toward Pearson."); *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) (affirming district court's dismissal of claims for declaratory relief as moot because plaintiff had been transferred).

Accordingly, Defendants' motion for summary judgment is **granted** as to Mr. Dotson's claims under the Indiana Constitution.

## V.
## Conclusion

For the reasons stated above, Defendants' motion for summary judgment, dkt. [71], is **granted** as to Mr. Dotson's claims against Dr. Perez, his Eighth Amendment claims against Wexford, and his claims under the Indiana Constitution and **denied** as to his Eighth Amendment claims against Dr. Mitcheff. His claims against Dr. Perez, his Eighth Amendment claims against Wexford, and his claims against Dr. Mitcheff and Wexford for money damages under the Indiana Constitution are **dismissed with prejudice**. Any claims for injunctive or declaratory relief under the Indiana Constitution are **dismissed for lack of jurisdiction**.

Because Mr. Dotson's Eighth Amendment claims against Dr. Mitcheff remain pending, final judgment will not enter at this time.

The **magistrate judge is asked to hold a settlement conference**.

The **clerk is directed** to remove Dr. Perez and Wexford as defendants on the docket.

**IT IS SO ORDERED.**


Date: 2/10/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


Distribution:

Annemarie Alonso
SAEED & LITTLE LLP
annie@sllawfirm.com

Heather Terese Gilbert
CASSIDAY SCHADE LLP
hgilbert@cassiday.com

Marley Genele Hancock
CASSIDAY SCHADE LLP
mhancock@cassiday.com

Jonathan Charles Little
SAEED & LITTLE LLP
jon@sllawfirm.com

Gabrielle Emilia Olshemski
SAEED & LITTLE LLP
gaby@sllawfirm.com

Jessica A. Wegg
SAEED & LITTLE LLP
jessica@sllawfirm.com